J-A11038-21 & J-A11039-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF J.J.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.R., SR., FATHER | : | No. 1121 WDA 2020 |

Appeal from the Order Entered July 30, 2020
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0000046-2016


| | | |
|---|---|---|
| IN THE INTEREST OF I.M.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.R., SR., FATHER | : | No. 1122 WDA 2020 |

Appeal from the Order Entered July 30, 2020
In the Court of Common Pleas of Jefferson County Civil Division at No(s):
CP-33-DP-0047-2016


| | | |
|---|---|---|
| IN THE INTEREST OF: J.X.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.R., SR., FATHER | : | No. 1123 WDA 2020 |

Appeal from the Order Entered July 30, 2020
In the Court of Common Pleas of Jefferson County Domestic Relations at
No(s):  CP-33-DP-0048-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: T.T.R., JR.,<br>A MINOR | :<br>:<br>:<br>:<br>:<br>: | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| APPEAL OF: T.R., SR., FATHER | : | No. 1124 WDA 2020 |

Appeal from the Order Entered July 30, 2020
In the Court of Common Pleas of Jefferson County Domestic Relations at
No(s): CP-33-DP-0049-2016

| | | |
|---|---|---|
| IN RE: J.J.R. | :<br>:<br>:<br>: | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| APPEAL OF: T.R., SR., FATHER | : | No. 1282 WDA 2020 |

Appeal from the Decree Entered November 9, 2020
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s): No. 23A -2020 O.C.

| | | |
|---|---|---|
| IN RE: I.M.R. | :<br>:<br>:<br>: | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| APPEAL OF: T.R, SR., FATHER | : | No. 1283 WDA 2020 |

Appeal from the Decree Entered November 9, 2020
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s): 24A-2020 O.C.

| | | |
|---|---|---|
| IN RE: T.T.R., JR. | :<br>:<br>:<br>: | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| APPEAL OF: T.R., SR., FATHER | : | No. 1284 WDA 2020 |

Appeal from the Decree Entered November 9, 2020
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s): 25A -- 2020 O.C

J-A11038-21 & J-A11039-21

IN RE: J.X.R.                          :        IN THE SUPERIOR COURT OF
                                       :         PENNSYLVANIA
                                       :
                                       :
APPEAL OF: T.R., SR., FATHER           :        No. 1285 WDA 2020

Appeal from the Decree Entered November 9, 2020
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  No. 26A-2020 O.C.


BEFORE:  McLAUGHLIN, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:                          **FILED: JULY 8, 2021**

These two sets of consolidated cases concern the four minor, dependent children of T.R., Sr. (Father), who is incarcerated, and K.R. (Mother): a female, J.J.R. (born in April of 2004), and three males, I.M.R. (June of 2006), T.T.R., Jr., (July of 2007), and J.X.R. (May of 2009) (collectively, the Children).  At dockets 1121, 1122, 1123, and 1124 WDA 2020, Father appeals *nunc pro tunc* from the July 30, 2020, orders entered in the Jefferson County Court of Common Pleas, changing the Children's permanency goals to adoption.[1]  At dockets 1282, 1283, 1284, and 1285 WDA 2020, Father appeals from the trial court's November 9, 2020, orders, involuntarily terminating his

_____

[1] ***See*** 42 Pa.C.S. § 6351 (disposition of dependent child).

- 3 -

parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[2] For ease of review, we address these appeals together, and affirm.

## I. 1121, 1122, 1123, & 1124 WDA 2020 — Goal Change

We first set forth the relevant facts and procedural history underlying the goal change orders. Mother lives in Texas, although the record does not readily indicate when she moved there. On August 26, 2016, CYS filed motions for emergency protective custody regarding the Children, but, that same day, filed praecipes for discontinuance.

Almost one and a half years later, on February 15, 2018, CYS again filed motions for emergency protective custody, and the trial court entered emergency protective custody orders and removed the Children from Father's home. We note that at this time, J.X.R. was eight years old, T.T.R., Jr., was 10, I.M.R. was 11, and J.J.R. was 13. On February 20th, CYS filed dependency petitions for each of the Children, and the court entered a shelter care order.

_____

[2] Mother did not appeal from the goal change orders, and at the termination hearing, voluntarily relinquished her parental rights. N.T., 10/23/20, at 5-11. She has not filed a brief in any of Father's appeals.

Additionally, we note there is a typographical error on the cover page of the October 23, 2020, termination hearing transcript. That cover page erroneously states a date of July 29, 2020 (the date of the goal change hearing). As we will cite to both hearing's transcripts, we will utilize the correct date, October 23rd, for the termination hearing.

On March 1st, the court entered orders[3] of adjudication and disposition, finding the Children dependent pursuant to 42 Pa.C.S. § 6302 (definition of "dependent child" (1), as without proper parental care and control), because Father was incarcerated and Mother was not present. The court placed legal and physical custody in CYS, and CYS placed the Children in kinship foster care with Ms. J.B. and Mr. L.B. ("the B.s"). CYS also filed motions for modification of the Children's placement, alleging Father was released from incarceration on February 28, 2018. CYS requested the court return the Children to Father and maintain the Children's dependency, with medical and educational rights in CYS. The trial court granted both of these requests.

Following a permanency review hearing on May 30, 2018, the court maintained the same legal and physical custody arrangement. Following another permanency hearing on August 29th, the court entered orders maintaining physical custody in Father, and returning legal custody, including medical and educational rights to Father.

On December 12, 2018, CYS filed motions for emergency protective custody of the Children. On that same date, the trial court entered orders transferring legal and physical custody to CYS and removing the Children from

_____

[3] We note that although the text of these orders were dated February 27, 2018, they were not entered on the docket until March 1st. Throughout this memorandum, for ease of review, we will similarly refer to the various orders and filings with the date of their docket entry, rather than any dates stated in the text of the orders.

Father. We note the Children have continuously been in placement since that date. The following day, December 13th, the trial court entered shelter care orders, placing the Children in foster care with one family, to be moved back to the B.s' home for kinship foster care on December 19th.

On December 20, 2018, CYS filed dependency petitions. On January 23, 2019, the trial court held an adjudicatory and dispositional hearing. The next day, the court adjudicated the Children dependent pursuant to 42 Pa.C.S. § 6302(1), and granted legal and physical custody to CYS. Throughout this case, Father's goals under the family service plan were generally: complete both a drug and alcohol evaluation and mental health evaluation and comply with any recommendations; participate in "Family Preservation;" be consistent with visits; and cooperate with CYS. N.T., 7/29/20, at 23-24.

On February 13, 2019, the trial court entered orders, directing the Children remain in the foster home of the B.s while CYS awaited the completion of foster home certification requirements. On March 21st, the trial court ordered CYS to initiate an "Interstate Compact for the Placement of Children" with Mother for approval in the State of Texas. Thereafter, the trial court held permanency review hearings on April 25, September 26, and December 10, 2019.

On July 9, 2020, CYS sought a goal change for the Children, from reunification to adoption. The trial court held a permanency review hearing on July 20th. Neither Mother nor Father attended, but their respective

attorneys were present. Kerith Strano Taylor, Esquire, represented the Children as guardian *ad litem* (GAL). ***Id.***

CYS caseworker Sharon Hindman testified to the following. Mother was living in Texas, was not involved in any services, and was not sufficiently stable with employment and housing to obtain custody. N.T., 7/29/20, at 15, 19-20. The contact between Mother and the Children was appropriate, and CYS was not seeking to cease their contact. ***Id.*** at 25. Nevertheless, Mother agreed with the goal change. ***Id.***

Father was serving probation; no further information about this probation was presented at the hearing. ***See*** N.T., 7/29/20, at 16. Father completed a drug and alcohol evaluation, but in April of 2020 was discharged unsuccessfully from drug and alcohol treatment.[4] ***Id.*** at 15, 18. This

---

[4] Caseworker Hindman also presented the following testimony: "[T]he referral [was] in" for Father to participate in "Family Preservation with Bob Mudders," but Father "fired" Bob. N.T., 7/29/20, at 16. She further testified, somewhat not clearly:

> Bob had a tampered drug test. And he was . . . trying to get him to fail the test —
>
> * * *
>
> — which was just in a plastic baggie. The test was sealed. The cup was sealed just like we would take a test to him to do. So that's why — and he's a civil servant.
>
> [CYS attorney:] Obviously, a failed drug test?
>
> [Caseworker Hindman:] Well, yeah, he didn't take it. So —

discharge was also "against medical advice," meaning the treatment team believed he needed treatment. *Id.* at 18. Father was also discharged unsuccessfully from mental health treatment in May of 2020. *Id.* at 15. Caseworker Hindman repeatedly called Father to confirm his employment, but Father hung up on her and did not respond to her messages. *Id.* at 17. Father was not consistent with visiting the Children, although in the past he was consistent. *Id.* at 19.

Caseworker Hindman also offered the following testimony about the Children. They were all in foster care with the B.s, although CYS had identified potential alternative placement for T.T.R., Jr. and J.X.R., as the B.s were not able to provide permanency for them. N.T., 7/29/20, at 11, 20, 27. The potential foster parents lived close to the B.s, and J.J.R. could watch the younger two children after school. *Id.* at 27. All four Children were attending therapy at CORE in DuBois. *Id.* at 5, 8.

---

Q    Is he — he's still on probation right?

A    Yes, he is.

*Id.* at 16-17.

At the termination hearing, CYS Caseworker Melanie Hilliard testified that prior to a visit with the Children, Mudder presented Father with a drug test, but Father "refused to do [the] drug test because [the test] was in a ziploc bag." N.T., 10/23/20, at 62-63.

J.J.R. had completed tenth grade, was referred to an independent living program, and received her driver's license permit. N.T., 7/29/20, at 5-6. *Id.* In March of 2020, when the B.s went away for vacation for a week and J.J.R. was in respite care with her family and friends, J.J.R. had a series of three seizures, for which she was admitted to Penn Highlands as an inpatient for six days. *Id.* at 6. Since the B.s returned, J.J.R. had no additional incidents. *Id.* At the time of the seizures, J.J.R. was missing the B.s and had contact with Father. *Id.* J.J.R. had frequent, consistent, unsupervised contact with Mother *via* telephone and text messaging. *Id.* at 6-7. J.J.R. wished for the B.s to adopt her and to remain in their home, where she felt safe and secure. *Id.* at 7. The B.s met J.J.R.'s needs and welfare. *Id.* J.J.R. wished to continue to have contact with her brothers, T.T.R., Jr., and J.X.R., who were to be placed in a different foster home. *Id.* at 7-8.

I.M.R., who would continue to live with J.J.R. and the B.s, completed seventh grade and was referred to independent living. N.T., 7/29/20, at 8-9. He wanted visits with Father, but knew Father "needs to get his act together, and he keeps refusing drug tests." *Id.* at 9. I.M.R. accepted the idea of being adopted but did not want to lose contact with his siblings. *Id.* at 10.

T.T.R., Jr., would be entering seventh grade, was attending therapy once a week, but requested to increase his therapy. N.T., 7/29/20, at 9. Caseworker Hindman believed "he just needs someone to talk to and he feels comfortable." *Id.* T.T.R., Jr., had some issues viewing pornography and

"making some poor choices on his school computer at home and . . . inappropriate conversations with peers." *Id.* at 13. However, these issues have been addressed. *Id.* Caseworker Hindman believed that T.T.R., Jr., was too young to completely understand the situation, but T.T.R., Jr. wanted visits with Father, and also "wants [Father] to get his act together." *Id.* at 12.

J.X.R. completed fifth grade. N.T., 7/29/20, at 14. J.X.R. did not wish to have contact with Father because Father had forgotten his most recent birthday. *Id.* J.X.R. received assistance with reading. *Id.* at 15. None of the Children had an individualized educational program (IEP). *Id.*

The Children had been in placement for 19 months. N.T., 7/29/20, at 19. Caseworker Hindman testified that for a long time, the Children were hopeful they would be reunified with Father, but he "just kept going on a downward spiral." *Id.* She stated that the Children "are the adults in this situation," and the Children understand that the Parents need to address their issues. *Id.*

Neither Father nor Mother presented any evidence. The trial court found that dependency continued to exist, and changed the Children's permanency goal from reunification to adoption. N.T., 7/29/20, at 28. The goal change orders were entered the following day, on July 30, 2020.

On October 15, 2020, the trial court granted Father's motion for leave to appeal *nunc pro tunc*. Father then filed timely notices of appeal, along with

concise statements, from the permanency orders for each of the Children. On December 8, 2020, this Court *sua sponte* consolidated these appeals.

Father presents one issue for our review:

Whether the Trial Court erred in changing the permanency goal to Adoption?

Father's Brief at 5.

Father argues the goal change is not in the Children's best interests. He avers the trial court should not have changed the goal where T.T.R., Jr., and J.X.R. "did not have an appropriate foster home in place," and he (Father) "would have been more appropriate than moving the children to another foster home." Father's Brief at 7. Father also maintains the Children wish to have a relationship with him. We determine no relief is due.

We address this issue mindful of the following.

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*Interest of R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010). "It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *Interest of D.P.*, 972 A.2d 1221, 1225 (Pa. Super. 2009) (citation omitted).

Further, we have instructed:

Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting."

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations omitted).

We have stated:

"[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."

*In re J.D.H.*, 171 A.3d 903, 910 (Pa. Super. 2017) (citation omitted).

In its opinion regarding the goal change orders, the trial court stated as follows:

As the record reflects, the [C]hildren had already been in CYS's care for 19 months when the Court changed their permanency goal, and as the record reflects, Father was never more than minimally compliant with his family service plan throughout that time period. By July 29, 2020, that meant that he had been discharged from drug and alcohol treatment, had "fired" the employee Family Preservation had assigned to him, was refusing to communicate with [CYS] staff, and was not even visiting his children consistently. What it meant, moreover, was that three of the four children had lost all hope of and interest in Father regaining custody, while even the youngest understood that Father was to blame for the fact that he and his siblings were

- 12 -

still in placement and was showing a preference for a stable home over being with Father. As a result, all four children had come to the place where living with (or even having contact with) Father was not a priority, as long as they continued to have contact with one another.

By changing the goal from reunification to adoption, then, the Court exercised its discretion to move the [C]hildren out of a situation punctuated by waiting, disappointment, and uncertainty to one in which they were one step closer to permanent and stable living environments. That was what they wanted, and what Father's conduct and attitude over the months they were in the Agency's custody told the [c]ourt was that it would be a long time, if ever, before he rectified the conditions that prevented him from regaining custody. Changing the goal, therefore, was not an abuse of discretion; it was the Court doing exactly what the law and human decency demanded: looking out for the best interests of [J.J.R., I.M.R., J.X.R., and T.T.R., Jr.]

Trial Ct. Op., 12/7/20, at 1-2.

After a careful review, we conclude the record supports the trial court's decision. The record demonstrates that Mother and Father were not able to provide appropriate parental care or control for the Children. While Father correctly points out the Children stated a desire to remain in contact with or have visits with him, Father ignores the Children's desire, overall, to be adopted. The trial court did not abuse its discretion or err as a matter of law in concluding that the Children's lives should not remain on hold indefinitely and a goal change to adoption would be in their best interests.

We therefore affirm the July 30, 2020, orders changing the Children's permanent placement goals to adoption.

## II. 1282, 1283, 1284, & 1285 WDA 2020:

## Termination of Parental Rights

We now address Father's appeals from the termination of his parental rights. We incorporate the above discussion and summarize the ensuing procedural history.

After the trial court ordered the goal changes on July 30, 2020, CYS filed petitions on September 14th to involuntarily terminate the parental rights of Mother and Father to the Children. The trial court conducted an evidentiary hearing on October 23rd.[5] At this time, J.J.R. was 16 years old, I.M.R. was 14, T.T.R., Jr., was 13, and J.X.R. was 11.

CYS presented the testimony of its caseworker, Melanie Hilliard. Father, who was incarcerated, was present with his counsel and testified on his own behalf. Attorney Taylor also appeared as the Children's GAL. Attorney Joseph D. Ryan, the Children's legal interests counsel, participated via telephone. Mother appeared by telephone, voluntarily relinquished her parental rights, but stated she wished to have an "open adoption" and continued contact with the Children. N.T., 10/23/20, at 10.

CYS caseworker, Melanie Hilliard testified as follows. The Children were in the care of Father between March and December of 2018, with the court

---

[5] **See** n.2, **supra** (cover of October 23, 2020, termination hearing transcript mistakenly identifies the date of the hearing as July 29, 2020).

terminating its supervision over this family in August of 2018. N.T., 10/23/20, at 74. The Children were then placed with the B.s in December of 2018. *Id.* at 75. The first family service plan was dated April 6, 2018, and subsequent plans were issued on October 9, 2018, January 8, 2019, July 8, 2019, January 12, 2020, and July 21, 2020. *Id.* at 75-76. Caseworker Hilliard reviewed the family service plans with Father. *Id.* at 76. Father did not sign the July 20, 2020, plan because he was not cooperating with CYS at that time. *Id.* at 77.

The Children had been dependent for 22 of the preceding 22 months, and CYS was seeking termination due to the Children's length of time in placement and the Parents' inability to care for their needs or be available for them. N.T., 10/23/20, at 12. The Children had been continuously in care since December 2018, and prior to 2018 were previously in care. *Id.* at 13. The Children had not spent any time in the care of Father since that date. *Id.* at 14. J.J.R. and I.M.R. have been in foster care placement with the B.s, who met their needs and were interested in adopting them. *Id.*

The B.s requested new placement for T.T.R., Jr., and J.X.R., as they "had trouble keeping up with all the children and [T.T.R., Jr., and J.X.R.'s] constant fighting and the attention that they needed in school." N.T., 10/23/20, at 15. CYS then placed these two children with Mr. R.S. and Ms. K.S. (the "S.s"). *Id.* However, J.X.R. required more attention than the S.s could provide, and thus the S.s requested new placement for him. *Id.* On October 22, 2020 — the day before the termination hearing — CYS placed

J.X.R. with Mr. J.C. and Ms. L.C. (the "C.s"), who are willing to adopt him if the placement went well. *Id.*

Caseworker Hilliard testified all four Children had been attending therapy at CORE for the past two years. N.T., 10/23/20, at 79. The foster parents were meeting the Children's needs and welfare, and the Parents were unable to provide for the Children's needs and welfare. *Id.* at 18. Caseworker Hilliard discussed the termination of Mother's and Father's parental rights with the Children. N.T., 10/23/20, at 19-20. The two older children, J.J.R. and I.M.R., expressed that they do not want to return to Father and "are ready for adoption." *Id.* at 20. T.T.R., Jr. and J.X.R. "sometimes go back and forth in their answers, but [one day earlier, stated] they do not want to go back" to Father's care. *Id.* T.T.R., Jr. "at first was against adoption, but now that he realizes he has a steady home and he likes where he's at, he's willing to be adopted." *Id.* at 21. The youngest child, J.X.R., stated he would likewise want to be adopted "as long as he is in a nice home and is able to have contact with his siblings." *Id.*

J.J.R. "has been doing really" well in school, attended weekly therapy appointments at CORE in DuBois, and had obtained her driver's license permit. N.T., 10/23/20, at 21-22. The B.s met her needs and transported her to therapy and doctors' appointments, as well as to and from school. *Id.* at 22.

I.M.R. normally has good grades, but in the week prior to the hearing, he received some poor grades, and thus the B.s stopped his football practice

so that he could catch up with schoolwork. N.T., 10/23/20, at 23. *Id.* Caseworker Hilliard was not certain whether I.M.R.'s grades had improved as a result. *Id.* I.M.R. attended weekly therapy at CORE. *Id.* The B.s transport him to appointments and ensure he is doing his school work. *Id.* at 23-24. I.M.R. and T.T.R., Jr., attend the same middle school. *Id.* at 25.

T.T.R., Jr., has been "doing amazing since moving to" the S.s' home. N.T., 10/23/20, at 24. He was "on track for honor roll" and was playing football. *Id.* T.R.R., Jr., wished to be adopted by the S.s "because he feels like it's been going really well for him the two months that he's been there." *Id.* Casworker Hilliard testified the oldest three children were thriving in their placements. *Id.* at 27.

J.X.R. was doing well after he was moved to the S.s' home, but the S.s were spending too much time, eventually up to five hours per night, helping him with schoolwork. N.T., 10/23/20, at 25-26. The school adapted J.X.R.'s schedule and set a one-hour limit for his schoolwork. *Id.* at 26. He understood "he has to get his work done." *Id.* at 27. One day before the termination hearing, J.X.R. moved to his current foster home with the C.s, with whom he previously had two respites, totaling five days. *Id.* at 26-27. The C.s wished to adopt J.X.R. if he blended in well with their family. *Id.*

The Children had psychological assessments in 2018 and were following the recommendations. N.T., 10/23/20, at 28. Initially, the three boys had

mobile therapy, but it was not working out, and thus they switched to weekly CORE appointments. *Id.*

CYS last updated the family service plan on July 21, 2020. N.T., 10/23/20, at 28-29. It had the same goals as previous plans, but some goals were "end dated," meaning "completed or were not going to be completed." *Id.* at 29. Father, however, failed to complete most of his objectives. *Id.* at 35. He had mental health and drug and alcohol evaluations, and was diagnosed with major depressive disorder; unspecified anxiety disorder; stimulant use disorder; obsessive compulsive disorder; alcohol use disorder; and cannabis use disorder. *Id.* at 43. However, Father was discharged from mental health treatment for failure to attend the appointments, and discharged from drug and alcohol treatment for non-compliance.[6] *Id.* at 36-37, 40. At the time of the hearing, Caseworker Hilliard had not received any information that Father had returned to therapy or counseling. *Id.* at 46.

Furthermore, Father did not attend many of the Children's appointments, although in the fall of 2019, he attended T.T.R., Jr.'s emergency room visit for a concussion sustained in football practice. N.T., 10/23/20, at 35. Father was unable to provide and maintain living conditions for the Children, as he was incarcerated several times and moved several

---

[6] Due to the COVID-19 pandemic, Father's counseling appointments were by telephone. N.T., 10/23/20, at 40.

times. *Id.* at 35-36. He did not want to take parenting classes. *Id.* at 36. He did not take the Children to needed and preventative health and dental care. *Id.* at 36-37. Because of his incarcerations, Father has "never had a steady job," and has no financial stability. *Id.* at 37. Father was unable to meet the Children's basic needs for food, clothing, and housing. *Id.* Father attended some visits with the Children, but the Children were upset with the number of visits that were canceled. *Id.* Caseworker Hilliard testified Father did not maintain a relationship with the Children. *Id.*

Father was serving house arrest in February of 2019, but his "home arrest was withdrawn . . . due to nonpayment." N.T., 10/23/20, at 48. He returned home on March 4, 2019, but on May 15th was incarcerated again for "nonpayment and resisting arrest." *Id.* On July 7th, Father went to a home in Brookville, but it was under construction and lacked a refrigerator, stove, and beds. *Id.* On October 14th, Father returned to prison on new charges: possession of drug paraphernalia, public drunkenness, and criminal trespass. *Id.* at 49.

Father was released in January of 2020 and lived with his girlfriend and her roommate in a two-bedroom house. N.T., 10/23/20, at 49-50. Her home did not have room for the Children to stay there. *Id.* On February 5th, Father had an inpatient stay for "a mental break due to not seeing his son, [I.M.R.], after a wrestling match or practice." *Id.* at 50. Father then returned to his

girlfriend's home until May 13th, when he was again incarcerated due to violating his probation by refusing to take a drug test. *Id.* at 50-51.

By June 3, 2020, Father was released from incarceration and residing in an apartment that CYS did not evaluate. N.T., 10/23/20, at 51-52. Father was not complying with CYS at that time. *Id.* at 52. On July 30th, Caseworker Hilliard went to Father's home; drug paraphernalia was found inside. *Id.* Father refused to take a drug test and resisted arrest, and, at the time of the termination hearing, had been incarcerated since that date. *Id.* The same trial court presiding over the termination proceedings also imposed sentence in Father's criminal case. *Id.* at 54. Father received a sentence of two to seven years' imprisonment. *Id.* at 55.

Father attended 14 of the 56 possible visits with the Children — thus missing 42 visits — between May 17, 2019, and July 28, 2020; five of the 14 visits were conducted *via* videoconference due to the COVID-19 pandemic. N.T., 10/23/20, at 57, 59. Father missed 23 of the total 56 visits because he was incarcerated. *Id.* at 57-58. J.J.R. attended 2 of the 14 visits, but did not want to attend the remainder. *Id.* at 58. I.M.R. attended 8 visits, and likewise did not wish to attend the remainder. *Id.* at 58-59. T.T.R., Jr., and J.X.R. attended 11 of the 14 visits. *Id.* One visit occurred in prison, but only J.J.R. and T.T.R., Jr., attended, as I.M.R. and J.X.R. did not wish to see Father in jail. *Id.* at 60. The trial court's July 30, 2020, goal change orders directed that Father would not have further contact with the Children. *Id.* at 64.

Family Preservation was to assist Father to "get stabilized for the [C]hildren," helping him with his appointments and drug tests, and supervising the visits with the Children. N.T., 10/23/20, at 64, 81. Family Preservation was involved with the family between February of 2018 and October of 2018. *Id.* at 81-82. Father consistently worked with them until the end of the case, when he was unsuccessfully discharged for noncompliance. *Id.*

With respect to Section 2511(b) of the termination statute, Caseworker Hilliard testified the Children's developmental, physical, and emotional needs and welfare were being met by their respective foster parents, and that Father had not met their needs in the preceding 22 months. N.T., 10/23/20, at 72. Caseworker Hilliard stated Father's compliance with the family service plan had been "[v]ery minimal to none," and that he could not meet the Children's needs. *Id.* She opined it would be in the Children's best interests to terminate Father's parental rights and allowing Children to be adopted. *Id.* at 72-73. The Children conveyed to CYS they supported termination of Father's parental rights and they did not want to be reunited with him. *Id.* at 73.

Finally, Caseworker Hilliard testified Father had a clear understanding of what was expected of him under the family service plan. N.T., 10/23/20, at 83. Initially, the Children were optimistic that Father would remedy his issues and they would be reunified with him. *Id.* However, after Father's repeated incarcerations, drug use, and missed visits, the Children had a lot of

"heartbreak," were "ready to move forward in their life," and anticipated adoption. *Id.* at 85.

Father testified to the following. He was currently incarcerated in the Jefferson County Jail. N.T., 10/23/20, at 91. At the time of the goal change hearing, on July 29, 2020, he was incarcerated, and he did not know about the July 21, 2020, family service plan until mid-August, when he received it in prison. *Id.* at 91-92. Father went into a depression when he learned that following the July 29th hearing, he would not be permitted to have contact with the Children. *Id.* at 92.

With respect to providing housing for the Children, Father denied his girlfriend had a roommate, and testified her house did have a spare room that would have accommodated the Children. N.T., 10/23/20, at 94. Additionally, whereas CYS found the house he was renovating was unsuitable for the Children, Father did have beds for them. *Id.*

Father testified his psychologist or counselor at CenClear was Melinda, and he met with her once every two weeks, then once monthly, then over the phone because of the COVID-19 pandemic. N.T., 10/23/20, at 95-96. Father was in and out of employment during that time, and was working with temporary service agencies. *Id.* at 96. Father had one phone conference with Melinda, and, after the COVID-19 pandemic began, became more depressed. *Id.* Father was unaware that Melinda's mental health evaluation indicated that he was to follow up with Dr. John Shirey. *Id.* at 96. Father

recalled doing the intake at CenClear for drug and alcohol treatment, but he did not realize that CenClear had unsuccessfully discharged him from treatment. *Id.* at 97; CYS Exh. 5. Father testified that, in 2019, he was in drug and alcohol treatment while on probation and he was trying not to "mess up." *Id.* at 97-98.

Regarding visitation, Father stated that he went to his children's football practices and missed only three or four practices because of work obligations. N.T., 10/23/20, at 98. He also explained that Caseworker Hilliard required him to provide dinner for himself and the Children, but he had no money. *Id.* Father further missed some visits because he had lost his driver's license, and he had to rely on friends to transport him. *Id.* at 102. Regarding a missed visit because of his refusal to take a drug test, Father explained that he did not submit to a drug test because he believed Bob Mudders[7] had tampered with the drug test kit. *Id.* at 99-101. Father denied refusing to work with Mudders. *Id.* at 101. Father also complained that he requested a mediator for this case, but CYS refused his request. *Id.*

Father admitted that he had difficulty holding a job, and that he had lost a job because of a driving under the influence conviction and the loss of his driver's license. N.T., 10/23/20, at 102-03. Father then performed odd jobs.

---

[7] Whereas this individual's name is spelled "Mudders" in the goal change transcript, it is spelled "Muders" in the termination transcript.

*Id.* at 103. Father had been sentenced to "state time" in prison, was in a major depression, and wanted to visit the Children. *Id.* at 104. However, the trial court included a no-contact provision in the goal change orders, and thus he cannot visit with the Children or contact their foster parents. *Id.* at 104. Father stated that, as a result, the Children do not know that he is fighting for them and that he loves them, and that their removal hurts him. *Id.* Father does not want to have his parental rights terminated. *Id.* at 104. He believes CYS did not provide him with proper family services, and CYS neglected to contact him on a regular basis. *Id.* at 105. Father stated that he felt like he was in a conflict with CYS over the Children, like two parents struggling in court. *Id.* at 105. Upon release from prison, he would like to have contact with the Children, and for the Children to be happy and not feel like they are on a battlefield. *Id.* at 106. Father blamed CYS for placing "a wedge" between him and the Children. *Id.*

On cross-examination by the GAL, Father admitted that, in group text messages with Mr. Mudders and the CYS caseworker, he sent argumentative messages. N.T., 10/23/20, at 107. However, Father denied his text messages were threatening or inappropriate. *Id.* at 108-09. When questioned about his mental health, Father testified that he was suffering because of the frustration and separation that CYS caused when it removed his Children from him. *Id.* at 111. During this questioning, he requested the Children be "put . . . back in football practice . . . and . . . with their friends." *Id.* Father stated

he had once been involuntarily committed to a hospital, but when asked whether he was diagnosed with mental illness during the commitment, Father responded he had gone to the hospital of his own free will. *Id.* at 111-12.

On cross-examination by counsel for CYS, Father acknowledged CYS recommended that he receive mental health care and address his issues with drugs and alcohol. N.T., 10/23/20, at 113-14. Father complained that CYS never offered any services to him to reunify the Children with him. *Id.* at 114. Father asserted he sought CenClear's help himself, that Family Preservation came into the case three months prior to the start of the COVID-19 pandemic, and that CYS did not provide him with the mediator he requested for his dealings with Family Preservation. *Id.* at 114-15. Father acknowledged he had a mental health evaluation at CenClear in March of 2020, and was to follow-up with mental health counseling and drug and alcohol counseling. *Id.* Father denied that he received the notice of discharge for noncompliance from CenClear, in April of 2020, when he admittedly was living with his girlfriend in Grampian, Pennsylvania, at the address on the notice. *Id.* at 116-19. Father again testified that CYS drove a wedge between him and the Children.

At the conclusion of the hearing, the Children's legal interests counsel made the following statement:

> I met with the four . . . children earlier this week. The [C]hildren very, very, very clearly and for good reason want this termination to happen. They've been in the system for quite some time. All of them indicated they've been in the system for way too long.

They . . . want the termination to take place, and all of them are very much looking forward to the adoption happening.

N.T., 10/23/20, at 121.

The GAL made the following statement:

It's practically verbatim of what [the Children's legal interests counsel] shared with us. I've been the guardian for these kids since they came into care in February of '18, and at the outset, they were really excited that their dad was going to be able to regain custody of them. And over the course of time through the series of disappointments, they've really come to the place where they're looking forward to a new chapter in their life. They wish for the termination to be issued so . . . two of them can be adopted by the [B.s] and [T.T.R., Jr., can] explore adoption with the [S.s]. And we hope that we can find permanency for [J.X.R.] But even knowing that permanency isn't necessarily on the docket for [J.X.R.], he still wishes to see this happen. So we would ask for the termination to be issued for all four. . . .

N.T., 10/23/20, at 121-22.

In decrees entered November 9, 2020, the trial court involuntarily terminated Father's parental rights to the Children, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). On December 1, 2020, Father timely filed notices of appeal, along with concise statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On December 28, 2020, this Court *sua sponte* consolidated the appeals.

Father raises the following issues for our review:

1. Whether the Trial Court erred in terminating [Father's] parental rights under 23 Pa C.S.A. § 2511(a)(1)?

2. Whether the Trial Court erred in terminating [Father's] parental rights under 23 Pa C.S.A. § 2511(a)(2)?

3. Whether the Trial Court erred in terminating [Father's] parental rights under 23 Pa C.S.A. § 2511(a)(5)?

4. Whether the Trial Court erred in terminating [Father's] parental rights under 23 Pa C.S.A. § 2511(a)(8)?

Father's Brief at 2-3.

In his first three issues, Father avers the trial court erred in finding termination was proper under Section 2511(a). We note that Subsection (a)(1)provides for termination when the parents have "either . . . evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties" for at least six months. 23 Pa.C.S. § 2511(a)(1). Father notes CYS filed the termination petitions on September 14, 2020, and for two of the six months prior to that date, he was not permitted to have contact with the Children due to the goal change orders. Father's Brief at 6-7. Father maintains he did not refuse to perform parental duties, but rather was prohibited from doing so by the trial court.

Subsection (a)(2) provides for termination when the parent's "repeated and continued incapacity, abuse, neglect or refusal . . . has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being[,] and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2). Father asserts the last time he signed a family service plan was July 8, 2019, and from July of 2019 to August of 2020, he "was not aware of any goals [CYS] was requesting of him." Father's Brief

at 8. Father then argues the only objective he did not complete was housing, because he is currently incarcerated. *Id.* at 11. Prior to that, he had his own residence from December of 2018 through mid-2019; when he moved into his paramour's house, they did have a spare room that could accommodate the Children; and subsequently, Father moved into an apartment that had beds for the Children. *Id.* at 9. With respect to a mental health evaluation, Father cites his termination hearing testimony that he had never before seen CYS' mental health evaluation, but in any event, he continued to meet with his counselor as recommended. *Id.*, *citing* N.T., 10/23/20, at 96-97 (Father presented with CYS Exh. 3, CYS' mental health evaluation). It was not possible for him to complete the goal of obtaining healthcare and dental care for the Children, as they were not in his care. As for providing food and clothing: Father tried his best to provide financially; he had a job for two and a half or three years, then worked odd jobs; he worked with Family Preservation and the only reason he stopped working with them was his incarceration; he participated in visits and attended the Children's football practice and games; and he did complete a drug and alcohol evaluation. Father also avers there was no evidence he abused, neglected, or refused to parent the Children.

Finally, we note Subsection (a)(5) provides a trial court may terminate parental rights when

> [t]he child has been removed from the care of the parent by the court . . . for a period of at least six months, the conditions which

led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(5).  Subsection (a)(8) permits termination when

[t]he child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).  Father acknowledges the Children have been in foster care for 22 months, then argues, "The conditions that led to [their] placement . . . no longer exist."  Father's Brief at 13.  He maintains he "participated in all services to remedy the conditions that led to" the Children's placement, he will be released from prison "soon and will be able to perform his parental duties," and the Children have expressed they do not want termination of his rights.  *Id.*  We determine no relief is due.

We note the relevant standard of review:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record."  "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion."  "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will."  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously

- 29 -

emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

This Court has explained:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot

be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." **Interest of A.L.D.**, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[W]e will not toll the well-being and permanency of [a child] indefinitely." **In re Adoption of C.L.G.**, 956 A.2d 999, 1007 (Pa. Super. 2008) (*en banc*).

Finally, we note our Supreme Court has addressed a parent's incarceration with respect to Subsection 2511(a)(2):

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

**In re Adoption of S.P.**, 47 A.3d at 830–31 (Pa. 2012) (citations omitted).

Here, the trial court made the following factual findings based on the testimonial and documentary evidence:

> The [C]hildren's first contact with CYS occurred early in 2018. Father was scheduled to begin a period of incarceration on February 13 and had made arrangements for their care that were ultimately unsuccessful. [S.C.], with whom he had entrusted the boys, reported to CYS after just one day that she could not

- 31 -

continue being their caretaker, while [J.J.R.], whom Father had placed with the [H.] family, did not wish to be separated from her brothers and refused to return to the [H.'s] home after going to visit her brothers the following weekend.[ ] Deemed to be without proper parental control, therefore, all four were taken into CYS custody and subsequently adjudicated dependent. Father resumed physical custody after being released from jail but continued to receive [CYS] services until the Court terminated supervision on August 29, 2018, when Father reportedly experienced a mental health crisis that threatened the [C]hildren's physical safety and caused them to take refuge at a friend's house a few months later, however, the [C]hildren again found themselves in [CYS'] care. [Pursuant to] a second shelter care and dependency order, dated December 13, 2018 and January 23, 2019, respectively, [the Children] have been in placement ever since. Over the next year-and-a half, Father did little to get them back.

On July 29, 2020, the Court changed the [C]hildren's permanency goal to adoption and ordered that they have no further contact with Father. Until that day, he was afforded every reasonable opportunity and a network of individuals and agencies ready and willing to help him complete the long-standing objectives identified in his family service plan, as supplemented by additional Court-ordered requirements. He had [CYS Caseworker] Hilliard[,] Bob from Family Preservation, and Dr. John [Shirey] and Melinda from CenClear. Each was there to play a role in helping him reunite with his children. Each required Father's cooperation, though, and that was where it all unraveled.

In order to successfully complete mental health and substance abuse treatment, Father had to attend scheduled appointments. He did not. To achieve stable housing and maintain employment, Father had to stay out of jail. He did not. To maintain contact with his children, moreover, Father had to confirm visit times, appear for the visits, and submit to pre-visit drug tests as required by [CYS]. More often than not, he did not do those things, either. Excepting a few visits missed due to external circumstances, though, compliance was completely within his control.[FN 3]

_____

[FN 3] Father missed [42] of the [56] visits scheduled . . . between May 17, 2019 and July 28, 2020. He was in jail for [23] of them, but that fact is not mitigating under the circumstances. Among of

the [19] he missed while out of jail, [14] were without excuse, seven he missed because he preferred whatever brief interactions he had with the [C]hildren at sports practice; three he missed because he failed to timely confirm, two he missed because he simply did not show up, one he missed because he refused a drug test, and one he missed because he was unhappy with the supper [Caseworker] Hilliard offered to provide. Given that, the [c]ourt is unwilling to assume that Father would have attended all or even most of the other [23] had he been able.

_____

Though Father could not influence the weather or his work schedule, he alone could have decided to obey the laws and conditions of his probation — a decision that would have benefited him in terms of his employment, his housing situation, and his availability to see and interact with his children. He alone could have followed through with the recommended treatment for his mental health and substance abuse issues. And he alone could have chosen to cooperate with CYS (and, by extension, Family Preservation) rather than insisting that those items with which he was willing to comply be completed on his terms. In that regard, it was not his prerogative to insist that drug tests be performed at the courthouse; to substitute attendance at sports practices for scheduled visits that could be confirmed and monitored; or to condition a visit on the Agency's willingness to provide the meal of his choice.[FN 4]

_____

[FN 4] Even assuming that Father attended sports practices, the fact that no one, including him, provided any detail makes it irrelevant. [Caseworker] Hilliard only identified [I.M.R. and T.T.R., Jr.,] as playing a sport, and Father did not indicate differently. At best, then, he was only seeing two of his children at practices. More than that, though, he said nothing about any interactions he may have had with his sons at practices and, according to [Hilliard's] summary of visits, only reported to Hilliard that "he would rather see his kids for 5 minutes at practice." CYS Exh[.] 7. The most generous inference the record reasonably allows, then, is that Father watched two of his children play football several times between 7/26/2019 and 10/9/2019 and may have exchanged a few words with them before leaving.

_____

As his testimony made clear, even now Father does not accept responsibility for his failures. To cite a few examples, he

blames CYS for the fact that his children have repeatedly declined visits and now want the Court to terminate his parental rights; CenClear for the fact that he was unsuccessfully discharged from drug and alcohol treatment, claiming that no one told him it was required; and Family Preservation for discontinuing services to him even though he was the one who refused to continue working with Bob.

More than not accepting responsibility, Father will not even **acknowledge** his failures. When asked by CYS's attorney about not completing drug and alcohol treatment, for instance, he agreed that he was discharged by CenClear but would not concede that he had not finished. Prior treatment he had received as a condition of his probation, he suggested, satisfied the requirement that he follow up with any treatment recommended after a drug and alcohol assessment. Despite the clear health and safety risks about which [Caseworker] Hilliard clearly testified, moreover, Father insisted that the house he had rented . . . was adequate for the [C]hildren. In the same vein, he saw no problem with substituting unverified, unmonitored visits with his children during sports practice for scheduled visits set up by [CYS] or with refusing to submit to a drug test unless it happened at the courthouse.

Having chosen to view and treat CYS and its affiliates as adversaries trying to drive a wedge between him and his children, Father has succeeded in doing precisely that. His children, once optimistic that their family of five would be reunited, have reached a place where they **want** Father's rights to be terminated so that they can be adopted. Even [J.X.R.], who was moved to his third foster home just one day before the [termination] hearing, was [amenable] to being adopted as long as he would have "a good home" and continued contact with his siblings.[FN 5] He and his siblings have grown weary of the repeated disappointments that have accompanied Father's unwillingness to recognize and rectify the issues that have kept them apart for so long. They have been conditioned *by Father* to expect failure and are tired of living that way.

---

[FN 5] The Court is aware that [T.T.R., Jr., and J.X.R.] have vacillated on that point, which is not unexpected from thirteen- and eleven-year-old boys. Just one day before the hearing, though, they advised [Caseworker] Hilliard that they were in favor of termination. More tellingly, that was what they told both their

attorney and guardian *ad litem*, neither of whom they might reasonably have perceived as expecting one answer or the other.

. . . The [B.s] who took all four children into their home on December 19, 2018, will adopt the older two [children], while the [S.s] will adopt [T.T.R., Jr.,], who has been in their care since August 17, 2020.  For [J.X.R.] the outcome is less certain.  The [C.s], who took custody of him on October 22, 2020 after having twice provided respite care for him, identified adoption as their goal at the outset but could not commit until the boy had been there long enough for them to determine whether he would fit in with the family in the long term.  Nonetheless, [J.X.R.] had already been removed from one home after twenty months, from a second after only two months, and, understanding that the [C.s] might not be his final placement, was still certain that he wanted the termination petition filed in his name to be decided against Father.  His objective, as he expressed himself to Hilliard, was not to live with a specific family, but to live in "a good home" and stay connected with [J.J.R., I.M.R., and T.T.R., Jr.]

Were the Court to deny [CYS'] petitions, it would be at least another year before Father's circumstances would offer even the hope of future stability and reunification.  After finding that he was in violation of the conditions of his probation, the Court sentenced Father on October 7, 2020 to an aggregate prison sentence of two-to-seven years, making it his fifth and longest incarceration since February of 2019.[ ]  Even with credit for time served, that meant the soonest he could be paroled would be the first part of 2022.  Only then could he begin to establish a stable and suitable home environment and an income that would allow him to support himself and four children.  And only then could he re-engage with CenClear or another provider to complete mental health and substance abuse treatment.[7]

[FN 7]  It is theoretically possible that he could complete one or both in prison.  The Court has no authority over the Department of Corrections, though, and would be remiss to speculate either that both courses of treatment would be available to Father or that he would take advantage of them even if they were available.

Meanwhile, the [C]hildren have not been without proper care and supervision [by Father].

[All four children have been in placement since December 19, 2018. J.J.R. and I.M.R. continue to reside with the B.s] and are thriving. With one recent exception, both have done well in school, and when [I.M.R.] received poor grades the week before the termination hearing, the [B.s] took appropriate remedial action, withdrawing him from football practice so that he could focus on his school work. Both children are also continuing with and responding well to therapy and have had all of their physical and medical needs addressed by the couple. In expressing their desire to be adopted by the people that have served as their *de facto* parents [for] nearly two years, [J.J.R.] and [I.M.R.] have signaled that the [B.s] have likewise been meeting their emotional and psychological needs.

Having been moved to the [S.s'] home on August 17, 2020, [T.T.R., Jr.,] is also excelling. According to [Caseworker] Hilliard, in fact, he is doing "amazing" in their care and wants them to become his permanent family.

[J.X.R.], as indicated above, has proven to be more of a challenge for [CYS]. More needy than their older siblings, he and [T.T.R., Jr.,] went to live with the [S.s,] then [after two months, the S.s requested new placement for J.X.R. because] the attention he demanded was putting too much of a strain on the family. The same may end up being true with the [C.s]. Or it may not. Even knowing that the [C.s'] home may not be his final placement, though, [J.X.R.] wants to be made available for adoption. His desire is simple and sad: he just wants "a good home" and apparently recognizes that he will not find that with Father. Having now spent time with four foster families, moreover, he has apparently concluded that CYS will eventually find him "a good home."

Trial Ct. Op., 11/9/20, at 1-5 (footnotes in original).

The trial court found Caseworker

Hilliard had advised Father both orally and in writing of the objectives he must meet before he could regain custody of his children. For the most part, Father failed or refused to comply, and it was, to a significant extent, because of his pride. He was determined to force [CYS] to accept his vision of what constituted compliance with the service plan, whether that meant agreeing to

administer all drug tests at the courthouse, counting brief interactions at sports practice as completed visits with the [C]hildren, or deeming prior drug and alcohol treatment to have satisfied CenClear's assessment that he needed such treatment in 2020. Getting his way — showing the Agency that it could not tell him what to do — took precedence over getting his kids back. In the end, though, it was a failed strategy that kept Father from being eligible to regain custody **and** alienated his children.

Father's conduct, while perhaps not indicative of a settled purpose to relinquish his parental claim to [the Children], is certainly indicative of a man who has refused or failed to perform his parental duties and thereby left his four children without the essential parental care, control or subsistence necessary for their physical well-being. This has been the case for nearly two years now, and the fact that Father will be spending a minimum of approximately seventeen more months in state prison guarantees that he will not be able to remedy his incapacity any time soon. Considering his persisting animosity toward [CYS] and continued conviction that persons and entities other than him are to blame for most of his problems, in fact, the Court does not expect that he would cooperate with CYS to complete his service plan goals even upon his release.

Trial Ct. Op. 11/9/20, at 7. The court thus concluded termination was proper under, *inter alia*, Subsection 2511(a)(2):.

Father will not be able to rectify the situation within a reasonable timeframe[.] His children have already been in placement for nearly twenty[-]three months, and the [c]ourt will not require them to continue down the road of uncertainty merely because Father, who has made little effort thus far, says he will obtain appropriate housing and employment when he gets out of prison.

*Id.* at 8.

Our careful review of the record in this matter reveals that the trial court's findings of fact and credibility and weight determinations are supported by the record. *See In re T.S.M.*, 71 A.3d at 267. We conclude the trial court did not err in finding termination was proper under Subsection 2511(a)(2)

- 37 -

("The [parent's] repeated and continued incapacity, abuse, neglect or refusal . . . has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."). *See Adoption of M.E.P.*, 825 A.2d at 1272. Father's incarceration was but one factor that the court weighed against other evidence presented. *See Adoption of S.P.*, 47 A.3d at 825. While Father argues this Court should accept only his testimony, he ignores the extensive evidence presented by CLS, which was credited by the trial court. To the extent Father's testimony contradicted CYS' evidence, we defer to the court's credibility determinations. *See T.S.M.*, 71 A.3d at 267. As we affirm the termination under Subsection 2511(a)(2), we need not review the other subsections relied upon by the trial court. *See B.L.W.*, 843 A.2d at 384.

Father's final claim on appeal is that the trial court erred in determining termination was proper under the best-interest-of-the-children analysis under Subsection 2511(b). He alleges he "continued to be a part of the [C]hildren's lives as much as he could. He would go to their football practice and . . . games." Father's Brief at 14-15. Father also contends J.X.R. has had two "failed foster home[s]," the four Children are not placed together, and it would be in their best interest to be placed with Father. *Id.* at 15. Father also cites Caseworker Hilliard's testimony that T.T.R., Jr., and J.X.R. "sometimes go

back and forth in their answer" as to whether they wish to be adopted. *Id.*

We conclude no relief is due.

Subsection 2511(b) provides:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

This Court has explained:

> Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b). In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well.

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted

"Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). "'Above all else . . . adequate consideration must be given to the needs and welfare of the child.' A parent's own feelings of love

and affection for a child, alone, do not prevent termination of parental rights."

***In re Z.P.***, 994 A.2d at 1121.

Regarding section 2511(b), the trial court stated as follows:

As for the best interests of the [C]hildren . . . terminating Father's parental rights is the most effective way to meet them. Three of the four [Children, J.J.R., I.M.R., and T.T.R., Jr.,] have clearly expressed their desire to be adopted by their current foster parents, and both the [B.s] and the [S.s] intend to do exactly that should the [C]hildren become adoptable. [J.X.R.] wants to be adopted, as well, though his prospects are less certain at this time. What he shares with his siblings, though, is the common belief that his life will be better without Father. Having now been in the care of four different families — [an initial family placement] for eight days, the [B.s] for twenty months, the [S.s] for two months, and now the [C.s], he has evidently developed a clear sense that CYS will make sure he has "a good home" with someone other than Father.

With respect to parent-child bonds, it seems that [J.J.R.] and [I.M.R.] no longer share one with Father. They have expressed as much by making known their preference to have his rights terminated and be adopted by the [B.s] and have further demonstrated it via their visiting history, [I.M.R.] having attended barely more than half of the visits that occurred between May 17, 2019 and July 28, 2020[,] and [J.J.R.] having attended only two. [T.T.R., Jr., and J.X.R.] seem to be more attached to Father; both attended visits far more frequently and vacillated about whether they wanted his rights to be terminated. Whatever bond they share, however, is not so strong that it has blinded them to Father's parental incapacity or kept them from ultimately deciding that a stable life with adoptive families who will meet their needs is better than maintaining legal ties to the man who, because of his unwillingness to cooperate with CYS in order to be reunited with them, has been a continual source of disappointment. The Court is thus confident that terminating Father's rights would not destroy an existing, necessary, and beneficial relationship.

Trial Ct. Op., 11/9/20, at 8.

After a careful review of the record, we conclude the trial court did not abuse its discretion or err in finding termination was proper under Subsection (b). The court thoroughly discussed the state of the relationships between Father and each Child, and each Child's expressed desire to be adopted — factors that Father ignores on appeal. We therefore affirm the orders terminating Father's parental rights to the Children under Subsections 2511(a)(2), and (b).

### III. Conclusion

We affirm the July 30, 2020, orders changing the family goals to adoption. We further affirm the November 9, 2020, orders involuntarily terminating Father's parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/8/2021